## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## (3:14-cv-76-GCM)
## (3:00-cr-147-GCM-DSC-1)

| | | |
|---|---|---|
| **MOHAMAD YOUSSEF HAMMOUD,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside, or

Correct Sentence pursuant to 28 U.S.C. § 2255, (Doc. No. 1), on the Government's Motion for

Summary Judgment, (Doc. No. 12), on Petitioner's Motion for Recusal of the undersigned, (Doc.

No. 7), on Petitioner's Motion for Discovery, (Doc. No. 16), and on Petitioner's Motion to Rule

on Petitioner's Motion to Recuse, (Doc. No. 20).

## I.       BACKGROUND

### 1. Offense conduct

Pro se Petitioner Mohammed Hammoud is a Lebanese citizen and permanent resident of the

United States.  See United States v. Hammoud, 381 F.3d 316, 325 (4th Cir. 2004).  During the

mid-1990s, Petitioner was involved in a cigarette smuggling operation with his wife, cousins,

and one of his brothers.  Id. at 325.  The smuggling operation involved purchasing large

quantities of cigarettes in North Carolina and transporting them to Michigan to be sold.  Id. at

326.  Because Michigan imposes a significantly higher tax on cigarettes than North Carolina, the

operation was estimated to cost Michigan $3 million in lost tax revenues.  Id.

1

In addition to his role in the cigarette-smuggling conspiracy, Petitioner was also affiliated with Hezbollah, a designated Foreign Terrorist Organization ("FTO") operated by Shi'a Muslims in the Middle East.[1] Id. at 325-26. The organization opposes Western presence in the Middle East and provides humanitarian aid to Shi'a Muslims in Lebanon. Id. at 325. Petitioner was acquainted with several key members of Hezbollah, including Hassan Nasserallah, the general secretary; Sheikh Fadlallah, the spiritual leader; and Sheikh Abbas Harake, a senior military commander. Id. at 325-26. During weekly prayers he led for Shi'a Muslims in Charlotte, Petitioner solicited donations for Hezbollah and relayed them to Harake. Id. at 326. On one occasion, Petitioner contributed $3,500 of his own money to the organization. Id.

**2. Procedural History**

On March 12, 2002, Petitioner was charged by Second Superseding Bill of Indictment with seventeen crimes, including conspiracy to transport and sell more than $7.5 million in contraband cigarettes, in violation of 18 U.S.C. §§ 371 and 2342; marriage and immigration fraud, in violation of 8 U.S.C. §§ 1151(b)(2)(A)(i), 1325(c), and 1329; laundering proceeds from the sale of contraband cigarettes, in violation of 18 U.S.C. § 1956; participating in a racketeer-influenced and corrupt organization ("RICO") known as the Charlotte Hezballah cell for the purpose of selling contraband cigarettes to provide support for Hezballah, in violation of 18 U.S.C. § 1962; and providing material support in the form of military equipment and monetary aid to Hezballah, in violation of 18 U.S.C. § 2339B. (Crim. Case No. 3:00cr147, Doc. No. 590: Sealed Superseding Indictment). Following a lengthy jury trial, which ended on June 21, 2002, Petitioner was convicted of fourteen offenses, including immigration fraud, conspiracy to sell

---

[1] The organization is spelled interchangeably as Hezbollah, Hezballah, and Hizballah in the record before the Court, and this Order reflects the different spellings.

contraband cigarettes, money laundering, RICO, and providing material support to a designated

foreign terrorist organization.  (Id., Doc. No. 829: Jury Verdict).

### 3. At the first sentencing hearing, this Court sentences Petitioner to 155 years of imprisonment.

After Petitioner's conviction, a probation officer prepared a pre-sentence report ("PSR").

The probation officer recommended a base offense level of 24 after determining the amount of

tax evaded in the cigarette smuggling operation was greater than $2.5 million.  The probation

officer also applied several enhancements, including two levels for conviction under 18 U.S.C. §

1956; two levels for sophisticated money laundering; four levels for Petitioner's role as an

organizer or leader; two levels for obstruction of justice; and a 12-level enhancement for

committing a terrorist act.  The terrorism enhancement also placed Petitioner in a criminal

history category VI.  Using these calculations, the PSR recommended an adjusted offense level

of 46, which was treated as an offense level of 43 and carried a sentence of life imprisonment.

Overruling all of Petitioner's objections to the PSR, this Court adopted these recommendations

and imposed the maximum sentence on each count, to be served consecutively, resulting in a

sentence of 155 years under the then-mandatory sentencing guidelines.  (Id., Doc. No. 930:

Judgment).

### 4. Petitioner appeals his conviction and sentence.

On appeal, Petitioner challenged numerous aspects of his conviction and sentence, all of

which the Fourth Circuit denied.  See United States v. Hammoud, 381 F.3d 316 (4th Cir. 2004).

Petitioner first challenged the constitutionality of 18 U.S.C. § 2339B (providing material support

to a known foreign terrorist organization), as impermissibly restricting his freedom of association

rights, as unconstitutionally overbroad and vague, and as unconstitutionally restricting his ability

to challenge Hezbollah's status as a foreign terrorist organization.  Id. at 323-31.  The Fourth

Circuit rejected each of these claims.  Id. at 329-31.

Petitioner next challenged the surveillance evidence collected against him under the

Foreign Intelligence Surveillance Act ("FISA") and from Canadian Intelligence Summaries.

First, Petitioner claimed the wiretap authorization was not based on probable cause.  Id. at 332.

The court disagreed and found there was sufficient probable cause.  Id.  Next, Petitioner alleged

that the official certification that the wiretaps were seeking foreign intelligence information was

erroneous.  Id. at 333.  The court denied this claim because the materials submitted indicated that

foreign intelligence was the primary target in the investigation.  Id. at 333-34.

Finally, Petitioner claimed that the Government failed to minimize the surveillance

against him, as FISA requires.  Id. at 334.  The court rejected this argument, holding that

recording innocent conversations was not sufficient enough to show that the Government failed

to minimize surveillance.  Id.  With regard to the Canadian Intelligence Summaries, Petitioner

claimed their admission at trial was error but the court dismissed this claim because Petitioner

stipulated to the admissibility of the summaries and thus waived any objection.  Id. at 335.

Petitioner additionally challenged on appeal the expert testimony of Matthew Levitt.

First, Petitioner argued that this Court should have excluded Levitt's testimony because the

Government failed to comply with a discovery order.  Id.  The Fourth Circuit, however,

determined that this Court did not abuse its discretion in not sanctioning the Government because

the Government kept defense counsel and this Court informed of its efforts to locate an expert

witness and defense counsel did not seek a continuance.  Id. at 336.

Petitioner next contended that this Court erred in qualifying Levitt as an expert under

Daubert.  Id. at 335.  The Fourth Circuit disagreed, finding that Levitt used a methodology

generally employed in the social sciences and applied this methodology in reaching his conclusions.  Id. at 337.  Petitioner also challenged this Court's refusal to allow defense counsel to question Levitt on certain classified material during the Daubert hearing, claiming this prohibition violated the Classified Information Procedures Act ("CIPA") and the Confrontation Clause.  Id. at 338.  The Fourth Circuit rejected both contentions, finding that this Court never ordered the Government to disclose classified information and Levitt did not rely on any classified information in forming his opinion on Petitioner's relationship to Hezbollah.  Id. at 338-39.

Petitioner additionally challenged the admission at trial of Hezbollah videotapes found in his home as irrelevant and unfairly prejudicial, and he challenged the way in which the Government presented the videotapes at trial (using a translator and rewinding the videotapes on several occasions for the translator).  Id. at 340-42.  The Fourth Circuit denied these challenges because the videotapes proved Petitioner's intent during the prayer meetings and his knowledge of Hezbollah's terrorist activities.  Id. at 341-42.  The Fourth Circuit also found nothing prejudicial in the Government's use of a translator and rewinding the video for the translator because it would have been "exceedingly difficult, if not impossible" for the jury to follow along with the video without that assistance.  Id. at 343.

Petitioner also raised several other miscellaneous challenges to his conviction.  Id. Petitioner claimed that this Court improperly combined counts 71 and 72, thus constructively amending the indictment.  Id. at 343.  The Fourth Circuit dismissed this challenge because the jury discussion surrounding count 72 only concerned whether it involved a single or multiple conspiracies.  Id. at 344.  The court also rejected Petitioner's assertion that the Government's cross-examination constituted "fearmongering" and violated his right to a fair trial, reasoning

that the questions were designed to undermine Petitioner's claim that he only supported the humanitarian mission of Hezbollah.  Id.  Petitioner similarly asserted that this Court should not have admitted expert testimony on "the possible aviation applications of equipment purchased in Canada by Said Harb and others, arguing that the sole purpose of such testimony was to 'instill[] fear and prejudice in a post-September 11 jury.'"  Id.  The Fourth Circuit denied this contention, finding that the testimony was relevant to prove Count 72 and it was not unfairly prejudicial.  Id.

As to Petitioner's sentence, the Fourth Circuit held, in a since-overruled holding, that Blakely did not render the guidelines advisory, and the court reaffirmed Petitioner's sentence. Id. at 348.  Petitioner also challenged the application of U.S.S.G. § 3A1.4, the terrorism enhancement, to his sentence, alleging that the standard of proof should be higher than preponderance of the evidence.  Id. at 354.  The court noted that circuits differed on the level of proof required for this enhancement, and, accordingly, found that any error was not plain.  Id. at 354-55.  The court also denied Petitioner's contention that U.S.S.G. § 2M5.3 should apply rather than § 3A1.4 because the charged offense involved a federal crime of terrorism.  Id. at 356. More significantly, the Fourth Circuit determined that there was sufficient evidence to support application of the terrorism enhancement.  Id.  Specifically, the court found:

> The evidence presented at trial established that [Petitioner] had close connections with Hizballah officials, including its spiritual leader and a senior military commander.  Other evidence–including [Petitioner's] own testimony–indicated that [Petitioner] was well aware of Hizballah's terrorist activities and goals and that he personally supported this aspect of Hizballah.  In short, the evidence presented at trial was sufficient to establish that [Petitioner] provided material support to Hizballah with the intent to influence or coerce government conduct.

Id. at 356.  Lastly, the court upheld application of the sophisticated money laundering and obstruction-of-justice enhancements.  Id. at 356-57.

Petitioner filed a petition for writ of certiorari with the Supreme Court.  On January 24,

2005, the Supreme Court vacated the Fourth Circuit's decision and remanded the case for consideration in light of United States v. Booker, 543 U.S. 220 (2005), see Hammoud v. United States, 543 U.S. 1097 (2005).  The Fourth Circuit, in turn, remanded the case to this Court for resentencing, United States v. Hammoud, 405 F.3d 1034 (4th Cir. 2005).  The Fourth Circuit noted the limited purpose of the remand: "Because the order of the Supreme Court does not affect our resolution of Hammoud's challenges to his convictions and the calculation of his guideline range, we reinstate those portions of our prior opinion."  Id.

**5. At the resentencing hearing, this Court resentenced Petitioner to 30 years of imprisonment.**

This Court conducted a resentencing hearing on January 26 and 27, 2011.  See (Criminal Case No. 3:00-cr-147-GCM-DSC-1, Doc. Nos. 1142; 1143).  On the basis of the Fourth Circuit's opinion, this Court held that the mandate rule and the law of the case doctrine precluded it from reconsidering any of the original Guideline calculations.  (Id., Doc. No. 1119).  Accordingly, this Court limited the issues at the resentencing hearing to whether a variance sentence was appropriate and, if so, what sentence to impose.  (Id.).

Before the sentencing hearing, Petitioner filed a motion for a downward variance, arguing, among other things, that a variance was appropriate because his sentence was disparately higher than other terrorism cases identified in his brief.  See (Id., Doc. No. 1032). The Government objected to any reduction in Petitioner's sentence and argued that the original sentence was appropriate because of the number of separate crimes committed by Petitioner, his close affiliation with senior leaders of a terrorist organization, and the danger he would present if released from prison.  (Id., Doc. No. 1037).

At the hearing, Petitioner presented evidence from Robert Baer, a former officer with the

7

Central Intelligence Agency and an author of several books on the Middle East. See (Id., Doc. No. 1142 at 15-53: Resent. Tr.). Baer testified about the dangers of Hezbollah, id. at 21 ("the most effective terrorist group in the world"); Fadlallah's role in Hezbollah, id. at 27-34 ("I don't think he was a terrorist" but he was not a "friend" to the United States and, indeed, preached jihad against the West); the accuracy of Israeli intelligence, id. at 36-38 ("brilliant" but also skewed by their motivation and propaganda); the accuracy of testimony by Matthew Levitt, the Government's expert at trial, id. at 39-41 (stating that he disagreed with Levitt's testimony that the military wing of Hezbollah was dependent on money raised in the United States); how money may be donated or funneled back to Hezbollah, id. at 41-42; his knowledge of "Sheikh Abbas Harake" being in the military wing of Hezbollah, id. at 44 ("no one knew him"); the reliability of Harake's affidavit to the court, id. at 45-46 ("it was pretty accurate"); his knowledge of Sayyed Nasrallah, id. at 47 ("the head of Hezbollah"); the possible innocent motives of someone who may have Nasrallah's speeches on videotapes in his home, id. at 49; and the general ability of a Lebanese person to call Fadlallah or his office to discuss social service needs or issues, id. at 53.

As Petitioner's lawyers continued to question Baer about things that had come up at the trial, the Court admonished the lawyers that "we're not going to retry the case . . . you guys had your shot at the expert at the trial and . . . we're not going there [at the resentencing hearing.]." (Id. at 57). On cross-examination, Baer stated that he disagreed with numerous other experts who identified Fadlallah as the leader of Hezbollah, id. at 64-65; admitted that he was not in Lebanon during various terrorist operations of Hezbollah, id. at 67-69; agreed that Petitioner must be a "pretty important person" if he, as he testified, could pick up the phone in the courtroom and get Fadlallah on the phone immediately," id. at 71; and agreed that Iran may be

8

the predominant, but not necessarily the exclusive, source of funding for Hezbollah's military wing, id. at 78-79.

Petitioner also presented testimony from Theresa Finocchio, in an attempt to show that Haissam ("Sam") Nashar, with whom she had had a "personal relationship," lied at trial, id. at 82-84, when he testified against Petitioner. Specifically, Nashar had testified, among other things, about Petitioner's cigarette-smuggling operations and Petitioner's financial support of Hezbollah. Finocchio testified that she had a conversation with Nashar at a hotel in Charlotte, where he stated that he lied about Petitioner's involvement because (1) Petitioner "was a disposable person and that . . . he would not have any problems back in Lebanon because of it"; (2) Nashar wanted to "eliminate" Petitioner as a competitor in the cigarette smuggling industry; and (3) and he wanted time off of a jail sentence. (Id. at 84-85). Finocchio also testified that Nashar's brother-in-law knew that Nashar had lied and was "very upset with him" because of it. (Id. at 85). Finocchio was cross-examined extensively about her past criminal dealings and convictions, id. at 86-110, and her failure to bring up any mention of Nashar's purported perjured testimony until her third debriefing with federal agents, id. at 109-110. The Court subsequently made a credibility finding as to Finocchio, stating, "I don't believe [her]." (Id. at 164-65).

Finally, Petitioner presented testimony from Randolph Whitt, a CPA, who testified concerning the amount of money that Petitioner made from the cigarette smuggling operation and how much money would have been available to Petitioner. (Id. at 119-31). Whitt estimated that the "final income after expenses" was $228,502. (Id. at 130). Petitioner proceeded to ask for a downward variance sentence of ten years, considering that this case involved only "a small amount of money to help some orphans and nothing much," and to avoid unwarranted sentencing disparities with other defendants convicted of terrorism offenses. (Id., Doc. No. 1143 at 15; 18-

34).  The Government asked for a sentence within the guideline range, contending that a variance was not appropriate, considering the nature and circumstances of the offense.  (Id. at 36-44).  As part of its argument, the Government recounted some of the evidence linking Petitioner to Hezbollah and his support for them.  (Id. at 38-44).

Following arguments of counsel, the Court announced its findings.  Again acknowledging the mandate of the Fourth Circuit, the Court found that a correct calculation of the Guidelines resulted in a level 43, criminal history category VI.  (Id. at 60).  The Court then made the following factual findings: (1) "In 1992, [Petitioner] attempted to enter the United States from Lebanon with fraudulent documents"; (2) "[Petitioner] ultimately obtained permanent resident status by marrying a United States citizen, though the validity of that marriage and his two other marriages has been called into question"; (3) "[Petitioner] and several family members participated in a cigarette smuggling operation.  The conspirators purchased large quantities of cigarettes in North Carolina, smuggled them to Michigan, and sold them without paying Michigan taxes.  Estimates of the conspiracy value the quantity of cigarettes at approximately 7.5 million and determined that Michigan was deprived of about $3 million in tax revenues."; (4) "In 1996, [Petitioner] began leading weekly prayer services for Shi'a Muslims in Charlotte, during which he encouraged the members of the group to donate to Hezbollah, a designated foreign terrorist organization.  Evidence presented at trial indicated [Petitioner] was acquainted with multiple members of Hezbollah, including Sheikh Abbas Harake, a military commander and senior leader in the organization.  The government's evidence showed that on one occasion [Petitioner] donated $3,500 of his own money to Hezbollah."; and (5) "[Petitioner's] history demonstrates that he was recruited in Lebanon and sent to the United States to organize and lead a Hezbollah financial cell, and that he bought and smuggled

10

cigarettes in order to fund Hezbollah activities in the United States and abroad." (Id. at 61-63).

The Court applied those facts to the various § 3553(a) factors, and sentenced Petitioner to thirty

years' imprisonment, the maximum sentence for the money laundering offense and the material

support offense. (Id., at 63-69; 71).

**6. Petitioner and the Government appeal the 30-year sentence.**

Both Petitioner and the Government appealed the sentence. See United States v.

Hammoud, 483 F. App'x 865 (4th Cir. 2012). Petitioner challenged this Court's application of

the mandate rule, the admission of certain evidence at resentencing, and the reasonableness of

the sentence imposed. Id. at 868. The Government cross-appealed, challenging this Court's

sentence as substantively unreasonable. Id. at 869. In an unpublished opinion, the Fourth

Circuit affirmed the sentence in its entirety. Id. As to application of the mandate rule, the Fourth

Circuit held that its earlier opinion "effectively limited resentencing to consideration of a

variance sentence," and that this Court correctly limited the resentencing hearing to that issue

only. The Fourth Circuit rejected Petitioner's request "to chastise the district court for failing to

recalculate the guidelines sentence and relitigate issues laid to rest by [the Fourth Circuit's] prior

decision." See id. at n.4.

Petitioner next contended on appeal that this Court abused its discretion in admitting the

testimony of Matthew Levitt, the Government's trial expert, and FBI Special Agent David Yu for

resentencing. Id. at 870. Petitioner contended that "new evidence undermined the accuracy of

[Levitt's] testimony" and that restricting the cross-examination of Levitt and Yu, which included

hearsay statements about Harake, violated the Confrontation Clause and due process. Id. The

Fourth Circuit rejected these arguments. As to Levitt, the Fourth Circuit stated that it "d[id] not

believe the new evidence or Levitt's alleged bias or lack of expertise has so undermined his trial

testimony as to make it unreliable on due process grounds or under the guidelines," and, further, that "restricting cross-examination neither violated the Confrontation Clause . . . nor due process." Id. at 871 (internal citations omitted).

Finally, the Fourth Circuit rejected both parties' challenges to the 30-year sentence, finding that the sentence was substantively reasonable and justified by this Court's thorough analysis of the § 3553(a) factors. Id. at 872-73. The Fourth Circuit rejected Petitioner's repeated accusations that this Court ignored his resentencing evidence that purported to undermine the trial evidence, concluding instead that "the district court, thoroughly familiar with [Petitioner's] case, recognized its discretion but apparently (albeit implicitly) considered and credited the trial evidence over the sentencing evidence." Id. at 873. In sum, the Fourth Circuit concluded that the "district court, in a superior position, particularly given the history of this challenging case, explained the variance with sufficiently compelling justifications under the § 3553(a) factors." Id. at 875.

Petitioner sought rehearing and rehearing en banc, which the Fourth Circuit denied, entering its mandate on August 1, 2012. See (Fourth Circuit Case No. 11-4164, Doc. Nos. 84; 86; 87). Petitioner petitioned for writ of certiorari with the Supreme Court, which was denied, as was Petitioner's petition for rehearing, on April 29, 2013. (Id., Doc. Nos. 90; 93; 94). Petitioner then filed his initial motion to vacate on February 18, 2014, and his amended petition on May 14, 2014. In a 145-page brief, Petitioner raises numerous challenges to his conviction, his sentence, and the adequacy of his counsel at trial, sentencing, and on appeal. The Court ordered a response from the Government on June 17, 2014, and on September 24, 2014, the Government filed its response and a motion for summary judgment. Petitioner file a Reply/Response to the summary judgment motion on December 23, 2014. Petitioner has also filed a motion for recusal of the

undersigned judge in this matter, and a motion for discovery.

## II. STANDARD OF REVIEW

### A. Section 2255

Pursuant to Rule 4(b) of the Rules Governing Section 2255 Proceedings, sentencing courts are directed to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings" in order to determine whether a petitioner is entitled to any relief. If a petitioner's motion survives initial review and once the Government files a Response, the Court must then review the materials submitted by the parties to determine whether an evidentiary hearing is warranted under Rule 8(a) of the Rules Governing Section 2255 Proceedings. After having considered the record in this matter, including the parties' summary judgment materials, the Court finds that this matter can be resolved without an evidentiary hearing. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970). Furthermore, because Petitioner has not shown that discovery is warranted, the Court will deny Petitioner's pending motion for discovery.

### B. Summary Judgment

Summary judgment is appropriate in those cases where there is no genuine dispute as to any material fact, and it appears that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c)(2); United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). Where, however, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

## III.    DISCUSSION

### A.  Petitioner's Motion for Recusal of the Undersigned Judge

The Court first addresses Petitioner's motion for recusal.  In support of the motion to recuse the undersigned from adjudicating Petitioner's motion to vacate, Petitioner contends that the undersigned "has 14 years in this case and is biased or potentially biased to preserve that 14 years of investment even if Petitioner was harmed by error or misconduct."  (Doc. No. 7-1 at 3). Title 28 U.S.C. § 455(a) requires that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  Disqualification is required if a reasonable factual basis exists for doubting the judge's impartiality.  Rice v. McKenzie, 581 F.2d 1114, 1116 (4th Cir. 1978).  The Court will deny the motion to recuse.  Petitioner has not asserted sufficient facts setting forth grounds for disqualification of the undersigned under 28 U.S.C. § 455.[2]  The mere fact that the undersigned presided over Petitioner's trial and two sentencings does not establish bias requiring recusal from adjudicating Petitioner's Section 2255 motion to vacate.  Indeed, it is the general practice in Section 2255 cases for the sentencing judge to adjudicate the defendant's subsequent Section 2255 motion to vacate.  See United States v. Smith, 337 F.2d 49, 53-54 (4th Cir. 1964).  Moreover, although Petitioner has expressed dissatisfaction with this Court's rulings, he has not presented a reasonable factual basis for doubting the undersigned's partiality.  Petitioner's motion for recusal is denied.

### B. Prosecutorial Misconduct Claims

### 1. Brady and Giglio violations, and presentation of false testimony

---

[2]  Petitioner has also not filed an affidavit under 28 U.S.C. § 144, which provides that a person seeking recusal against a judge based on personal bias or prejudice must submit an affidavit with facts supporting the recusal.

In his first grounds for relief, Petitioner claims that he is entitled to a reversal of his convictions based on the Government's failure to disclose <u>Brady</u> and <u>Giglio</u> materials, and for failing to correct false testimony given by Sam Nashar, Matthew Leavitt, and Said Harb.  <u>See</u> (Doc. No. 1-1 at 11-34).

To show a <u>Brady</u> violation, Petitioner must show (1) evidence that was favorable to the defendant, whether directly exculpatory or of impeachment value; (2) that was suppressed by the government, either willfully or inadvertently, and (3) it must be material.  <u>See</u> <u>Spicer v. Roxbury Corr. Inst.</u>, 194 F.3d 547, 555 (4th Cir. 1999).  In <u>Giglio v. United States</u>, 405 U.S. 150 (1975), the Supreme Court held that when a witness's reliability may determine guilt or innocence, nondisclosure of evidence that affects credibility is a denial of fundamental fairness required by the Fifth Amendment's due process clause.  <u>Id.</u> at 154.  To prevail on such a claim, a petitioner must show a reasonable likelihood that disclosure would have affected the jury's judgment.  <u>Id.</u> Knowing use of perjured testimony violates due process when there is any reasonable likelihood that the false testimony could have affected the jury's judgment.  <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 n.7 (1995).  To prevail on a claim that a prosecutor failed to correct what he knew was false testimony, a petitioner must show (1) that the testimony was perjured and (2) that the Government knowingly used the perjured testimony to secure the conviction.  <u>Boyd v. French</u>, 147 F.3d 319, 329-30 (4th Cir. 1998) (citing <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959)).  "Mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony."  <u>United States v. Griley</u>, 814 F.2d 967, 971 (4th Cir. 1987).

**a. Hassam Nashar**

In his first ground for relief, Petitioner alleges that the Government engaged in prosecutorial misconduct when it failed to correct Nashar's alleged false testimony that he was

not "required" to testify, and that he was never promised leniency, a lighter sentence, or any other benefit for his testimony. See (Doc. No. 1-1 at 24-34). Petitioner again touts Finocchio's testimony at the resentencing hearing that Nashar lied, Nashar's purported admission to Petitioner in prison that he lied during his testimony, and the significance of Nashar's testimony to securing Petitioner's conviction. (Id.). For the following reasons, Petitioner's claim for relief fails.

First, there is no credible evidence, other than the narrative contained in the petition, showing that Nashar admitted to Petitioner in prison that he lied. There is no affidavit from Nashar or any other evidence, much less credible evidence, indicating that this exchange actually occurred. Nor is there any credible evidence that the Government made any promise of leniency to Nashar before his testimony. To the extent Petitioner relies again, as he did at the resentencing hearing, on Finocchio's testimony that Nashar admitted to her that he lied, this Court has already rejected Finocchio's testimony as not credible. See (Crim. Case No. 3:00cr147, Doc. No. 1142 at 164-65).

Second, Nashar's testimony was not nearly as important to securing Petitioner's conviction as Petitioner claims. Petitioner cannot point to any aspect of Nashar's testimony that was determinative of guilt or innocence, or otherwise affected the judgment of the jury.

### b. Matthew Levitt

Petitioner makes a similar challenge to the testimony of the Government's trial expert, Matthew Levitt, generally challenging his expertise (or lack thereof), his alleged pro-Israeli bias, and inconsistencies between his testimony and that of Said Harb, all of which the Government allegedly failed to correct. See (Doc. No. 1-1 at 21-33). For the following reasons, Petitioner's claim regarding Levitt's testimony is without merit.

Most significantly, the Fourth Circuit rejected Petitioner's renewed attack on Levitt's credibility in its affirmance of Petitioner's 30-year sentence. Specifically, the Fourth Circuit held that this Court acted within its discretion to rely on Levitt's testimony at the resentencing hearing, finding that the new evidence or Levitt's alleged bias or lack of expertise did not "so undermine[ ] his trial testimony as to make it unreliable on due process grounds or under the guidelines." Hammoud, 483 F. App'x at 871. The Fourth Circuit further held that "admitting this testimony despite restricting cross-examination neither violated the Confrontation Clause . . . nor due process." Id. Here, Petitioner has simply reasserted the same arguments as to Levitt's testimony that the Fourth Circuit already rejected. See Withrow v. Williams, 507 U.S. 680, 720-21 (1993) (Scalia, J., concurring) (collecting cases applying the bar to relitigation of issues decided on direct appeal). Furthermore, to the extent Petitioner relies on alleged inconsistencies between Levitt's and Harb's testimonies, "[m]ere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony." Griley, 814 F.2d at 970-71.

### c. Said Harb

Petitioner also argues that Said Harb's testimony concerning Petitioner's request that he deliver $3,500 to Harake was false testimony that the Government failed to correct. (Doc. No. 1-1 at 33-34). Specifically, Petitioner challenges three aspects of Harb's testimony: (1) that Harb said in his FBI interview that the envelope containing the checks was a "First Union" envelope, whereas Harb omitted this detail at trial; (2) that Harb told the FBI that he was supposed to deliver the envelope to Harake but delivered it to Petitioner's mother instead when he learned his brother was mad at Harake, whereas he testified at trial that Petitioner asked him to deliver the envelope containing the checks to his (Petitioner's) mother; and (3) that Harb's testimony that

Petitioner maintained an envelope at the Thursday night meetings for Hezbollah donations labeled "The Resistance" and "The Islamic Resistance," was internally inconsistent (Resistance vs. Islamic Resistance) and contradicted by two other witnesses, who testified that the envelope was not labeled. (Id.).

With respect to the alleged "First Union" discrepancy, this detail is not material enough to warrant an entirely new trial even if it were found to be untrue, instead of a minor omission on a minor detail. As to the delivery instructions, whether Petitioner instructed Harb to give the envelope to Petitioner's mother does not change the basic tenet of Harb's testimony that Petitioner sent, via Harb, several thousand dollars to a top military commander of Hezbollah. Thus, any such minor discrepancy in Harb's testimony is not material enough to undermine all of Harb's testimony or to overturn Petitioner's conviction. Finally, regarding the labeling of the envelope as "The Resistance," "the Islamic Resistance," or something else (or nothing else), this fact also does not sufficiently undermine confidence in the outcome of the proceeding to warrant a reversal of his conviction. No one disputed that Petitioner maintained an envelope at his home at the Thursday night meetings in which he solicited donations for Hezbollah. Thus, there was no "false" testimony that the Government failed to correct. To the extent there were minor inconsistencies between an FBI interview and testimony at trial, these minor inconsistencies about extraneous matters do not warrant the extraordinary relief Petitioner now seeks.

## 2. Closing Arguments

In his next set of claims, Petitioner alleges that the Government engaged in prosecutorial misconduct during closing and rebuttal arguments, violating Petitioner's due process rights. (Doc. No. 1-1 at 34-53). To prevail on this claim, Petitioner must show that the remarks were improper and that they prejudicially affected his substantial rights so as to deprive him of a fair

trial.  See United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993).  Because Petitioner did not

raise these claims on direct appeal, they are procedurally defaulted.  Bousley v. United States,

523 U.S. 614, 621 (1998).

This Court may not review the misconduct claims unless Petitioner can demonstrate

cause, such as ineffective assistance of counsel, and some resulting prejudice.  See Coleman v.

Thompson, 501 U.S. 722, 752 (1991); see also Schmitt v. Kelly, 189 F. App'x 257, 271-72 (4th

Cir. 2006) (unpublished) (applying procedural default to claims of prosecutorial misconduct

during closing argument).  As explained below, there was no misconduct, and Petitioner's

attorney was not ineffective for failing to object to the alleged instances of misconduct, so

Petitioner cannot excuse his procedural default.

It is well established that "[p]rosecutors enjoy considerable latitude in presenting

arguments to a jury, because the adversary system permits the prosecutor to prosecute with

earnestness and vigor."  Bates v. Lee, 308 F.3d 411, 422 (4th Cir. 2002) (internal citations and

quotations omitted) (additionally noting that "[c]ommitted advocates do not always present anti-

septic closing statements").  The numerous statements Petitioner now complains of were

appropriate summaries of testimony given over the course of the lengthy trial, and, in any event,

were isolated statements rather than extensive portions of either the closing argument or rebuttal.

See United States v. Scheetz, 293 F.3d 175, 186 (4th Cir. 2002).  Any improper phrases were

surely "diluted by days of testimony and argument about other matters."  United States v.

Wilson, 135 F.3d 291, 300-01 (4th Cir. 1998).  Moreover, this Court instructed the jury that the

evidence consisted only of the witnesses' testimony and admitted exhibits, and the prosecutor

reminded the jurors of this instruction at the start of his argument, even going so far as to remind

them to rely on their recollection of the evidence rather than his own ("Twelve minds are better

than one so I'm counting on you to remember all the evidence . . . ."). <u>See</u> (Crim. Case No. 3:00-cr-147-GCM-DSC-1, Doc. No. 1075 at 94; Doc. No. 1076 at 10-11).

Regarding Petitioner's arguments that the prosecutor "inflamed the passions of the jury" in the aftermath of September 11, the Fourth Circuit rejected a similar claim on direct appeal about the admission of testimony regarding dual-use equipment, finding that the testimony was not an effort to "instill[] fear and prejudice in a post-September 11 jury," but was, instead, relevant to prove the "material support" conspiracy charged in Count 72. <u>Hammoud</u>, 381 F.3d at 344. The same is true of the portions of the closing arguments to which Petitioner now objects.

### C. Ineffective Assistance of Counsel Claims

### 1. <u>Strickland</u> Standard

Petitioner alleges numerous instances of ineffective assistance of counsel by his trial attorney, Deke Falls. The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions the accused has the right to the assistance of counsel for his defense. <u>See</u> U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish deficient performance by counsel and, second, that the deficient performance prejudiced Petitioner. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Id.</u> at 689; <u>see also</u> <u>United States v. Luck</u>, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . <u>Strickland</u> if the 'result of the proceeding was fundamentally unfair or unreliable.'" <u>Sexton v. French</u>, 163 F.3d 874, 882 (4th Cir. 1998) (quoting <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." <u>Bowie v. Branker</u>, 512 F.3d

112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

### 2. Ineffective assistance of counsel regarding trial strategy

Petitioner makes numerous allegations of ineffective assistance of counsel relating to Attorney Falls' strategic trial decisions (see Claims A (expert), B (cross-examination), D (prepare witnesses), E (object), F (subpoena), G (verify phone call), H (videotapes), I (object), J (date of letter), K (language specialist), M (opening and closing), N (phone bills), O (checks), and P (cross-examination of defendant)). The Court will address each claim in turn.

### a. Failure to call certain witnesses (Claims A, F, and K)

In his first claim, Petitioner faults Attorney Falls for failing to retain an expert to testify that "Petitioner was an ordinary Lebanese Shia nationalist, but not Hezbollah." (Doc. No. 1-1 at 66). He suggests some of the things that an expert "could have testified to." (Id.). This rank speculation is not enough to overcome the presumption of reasonableness afforded trial counsel's strategic choices, or to show that the failure to call such an expert rendered his trial "fundamentally unfair." See Guerra, 628 F.2d at 413. Moreover, none of the hypothetical expert testimony would have overcome the testimony from other witnesses linking Petitioner to the Thursday night meetings, the propaganda videos, or the solicitation of money for "The Resistance" or "The Brothers."

In Claim F, Petitioner faults Attorney Falls for failing to call Abu Adam's father-in-law to testify that a letter that thanked Petitioner for "the recent delivery and meeting the needs of the believers" referred only to a delivery of medicine and clothes for Abu Adam's children. (Doc. No. 1-2 at 66-67). However, Petitioner's speculation of what the father-in-law may have

21

testified to is not enough to show deficient performance, nor is it enough to show that the outcome of Petitioner's trial would have been any different had one witness testified that on one occasion Petitioner brought clothes and medicine to Lebanese children. That testimony, even if accurate, would not have precluded the conclusion that Petitioner sent money on other occasions to Hezbollah.

In Claim K, Petitioner challenges Attorney Falls' failure to retain a "language specialist." (Doc. No. 1-2 at 6). He claims that his own translator would have correctly translated "our people" to "our group"; "under your service" to "goodbye"; "the guys" to "my guys"; and "Sayyed Fadlallah" to "Master Fadlallah." (Id.). Petitioner wholly fails to show how any of these translations, assuming they are correct, would have changed the outcome of Petitioner's trial, much less "infect[ed] his entire trial with error of constitutional dimensions." See Murray, 477 U.S. at 494. For this reason alone, this claim fails.

**b. Failure to cross-examine certain witnesses (Claim B)**

In Claim B, Petitioner challenges as ineffective Attorney Falls' failure to ask certain questions of several witnesses on cross-examination. See (Doc. No. 1-1 at 69-72). He specifically challenges the failure to ask certain questions of Harb, Levitt, and FBI Agent Khoury. Regarding Khoury, Petitioner now offers several questions that he thinks Attorney Falls should have asked and generally avers that "had the trial attorney raised these issues . . . they could have discredited agent Khoury's testimony and the jury would have been far more likely to believe Petitioner." (Id. at 71). Petitioner's bare allegations are not enough to show Strickland prejudice and, moreover, ignore that the crux of the Government's case came not from Agent Khoury but from the several other witnesses linking Petitioner to Thursday night meetings, solicitations of money, frequent contacts with known operatives of Hezbollah, and transferring

money to a senior military commander of Hezbollah.

With Harb, Petitioner lodges the same complaints he made in his prosecutorial misconduct argument about the Government's alleged failure to correct perjured testimony (i.e., the difference in envelopes).  (Id.).  The record, however, reveals that Petitioner's trial attorney vigorously contested the charges against Petitioner and the credibility of numerous witnesses, especially Harb.  Furthermore, allegations of inadequate cross-examination are viewed through this same prism of deference, as these are matters of trial strategy, and Petitioner has not offered enough evidence to overcome the presumption of reasonableness afforded these strategic choices.  See United States v. Guerra, 628 F.2d 410, 413 (5th Cir. 1980).  Petitioner's attorney chose his questions with an eye toward what he believed would matter the most to the jury, rather than focus on the extraneous matters now proffered by Petitioner.

### c. Failure to prepare defense witnesses (Claims D and G)

In Claim D, Petitioner generally alleges that Attorney Falls "failed to prepare any of the defense's witnesses" and that "they came to the trial not knowing what to testify about or what to expect."  (Doc. No. 1-2 at 3).  Petitioner provides no other details, facts, or even conjecture about how the defense witnesses would have testified differently, and how more thorough preparation would have changed the outcome of his trial.  Thus, this claim is subject to dismissal as wholly conclusory.  See United States v. Dyess, 730 F.3d 354, 359 (4th Cir. 2013).

Petitioner similarly, but with more specificity, objects in Claim G that Attorney Falls failed to verify that defense witness Kalini had called Fadlallah in an effort to prove that Fadlallah was easily accessible to the Lebanese public, and not just to someone who may have ranked highly as a supporter of Hezbollah.  (Doc. No. 1-2 at 4).  Even assuming that Attorney Falls did not so question Kalini before trial, the failure to do so did not infect the trial so much

23

that it rendered it fundamentally unfair or even called into question the verdict. The guilty verdict depended on much more than Petitioner's alleged access to Fadlallah. Thus, this claim fails because Petitioner cannot demonstrate <u>Strickland</u> prejudice.

**d. Failure to object to the admission of certain evidence or arguments of counsel (Claims E, H, I, M)**

In Claim E, Petitioner faults Attorney Falls for failing to object to the Government's statements in opening and closing that Petitioner knew Dbouk and erroneously inflated Dbouk's rank within Hezbollah. (Doc. No. 1-2 at 3). He makes a similar argument in Claim H that Attorney Falls failed to object to the prosecutor's argument that Petitioner's showing video tapes at his home indicated a tie to Hezbollah. (<u>Id.</u> at 4). However, the prosecutor's remarks were proper inferences from the evidence and relevant evidence of Petitioner's intent, and Attorney Falls did not act deficiently in failing to object to them. Indeed, unnecessarily and frequently objecting during the Government's opening statement or closing argument may have drawn the ire of the Court or the jury. Thus, Attorney Falls' decision not to object during opposing counsel's argument was reasonable.

Relatedly, also lacking in merit is Petitioner's assertion, in Claim M, that Attorney Falls failed to object when the prosecutor's forecast of evidence in his opening statement did not match up to the evidence actually elicited at trial. <u>See</u> (<u>Id.</u> at 8). With or without a presumption of reasonableness, it is reasonable for an attorney to fail to object during a prosecutor's forecast of evidence and, instead, argue or wait for the jury to realize that the prosecutor oversold his case. Thus, Petitioner has failed to show deficient performance on this point, and he similarly fails to show how the outcome of his trial would have been different had Attorney Falls made the now suggested objection.

In Claim I, Petitioner challenges Attorney Falls' failure to object to the Government's playing during trial of the videotapes seized from Petitioner's home and that Attorney Falls never viewed the tapes before trial.  (Id. at 5).  However, as this Court correctly held, and as the Fourth Circuit held on appeal, the tapes were "probative of Hammoud's intent during the prayer meetings—i.e., to solicit donations to Hizballah—and his knowledge of, and agreement with, the terrorist objectives of Hizballah."  Hammoud, 381 F.3d at 341.  The Fourth Circuit also held that the probative value of the tapes were not outweighed by any unfair prejudicial effect, and that the tapes contradicted Petitioner's claim at trial that he sympathized only with the humanitarian goals of Hezbollah.  (Id. at 341-42).  Thus, any further or different objection by Attorney Falls would have been overruled, so Petitioner is unable to demonstrate deficient performance or prejudice on this point.

### e. Miscellaneous complaints about counsel's performance

Petitioner also lodges an objection to Attorney Falls' failure to request a hearing to determine the date of a letter that Harake sent to Petitioner (Claim J).  (Doc. No. 1-2 at 5).  Petitioner contends that the letter was sent in 1992 or 1993, and that its contents were unfairly prejudicial in the wake of September 11.  (Id. at 6).  Again, Petitioner fails to demonstrate deficient performance or prejudice.  Even if the letter was dated several years before the offense conduct in this case, the letter still was relevant to show Petitioner's relationship with Harake, the anti-American sentiment that they espoused, and, as the Fourth Circuit recognized, Petitioner's intent.  It also negated his "humanitarian aid" defense.

In a similar claim (Claim N), Petitioner faults Attorney Falls for failing to challenge the accuracy of the Government's summary chart showing 36 "calls" from Petitioner to Harake on September 25, 1999, the day Harb was to arrive in Lebanon.  (Id. at 10-11).  Petitioner claims

that these calls were easily explainable because they represented merely the automatic redial feature, not because he was repeatedly trying to contact Harake.  (Id.).  The purported "automatic redial feature" versus repeatedly trying to contact Harake seems to be a distinction without a difference, as both types of evidence, no matter how Petitioner or Attorney Falls would have phrased it at trial, demonstrated that Petitioner was repeatedly trying to contact a Hezbollah operative on the day of Harb's arrival in Lebanon.  Thus, Petitioner cannot show that his chosen course of action for Attorney Falls would have affected the outcome of the trial; nor can Petitioner show, given the weakness of his own argument, that Attorney Falls' chosen course of action was objectively unreasonable.

Similarly, Petitioner faults Attorney Falls for failing to subpoena a bank representative to rebut the Government's evidence regarding the checks Petitioner allegedly delivered to Harb (Claim O), and he failed to "challenge the Government to prove the checks exist or at least argue to the jury that the check did not exist."  (Id. at 11).  Petitioner does not even speculate as to what testimony the bank representative would have offered.  Thus, he has not overcome the presumption of reasonableness afforded trial counsel's strategic witness choices, and he has not shown prejudice.  Attorney Falls pointedly and repeatedly challenged Harb's character and numerous aspects of his testimony.  Accordingly, Petitioner's other suggestions as to what Attorney Falls cannot overcome Strickland's presumption of reasonableness.

Finally, Petitioner challenges Attorney Falls' failure to object to the prosecutor's cross-examination of Petitioner regarding his co-defendants' guilty pleas and his failure to request a cautionary instruction that their guilty pleas could not be used against Petitioner (Claim P).  (Id. at 12).  However, an accurate reading of the record reveals that the prosecutor's question was in response to a question Attorney Falls asked Petitioner, and the follow-up question about "eight

of them pled guilty" was in response to Petitioner's answer, given before the question was asked, that "I know a lot of them – most of them pled guilty." (Id., Doc. No. 1099 at 32). Those questions were proper cross-examination, considering the questions previously asked and the answers previously given. Moreover, even if improper, the introduction of such evidence was harmless, considering that it was merely one or two questions in a lengthy cross-examination and dwarfed amidst a weeks-long trial. See United States v. Smith, 398 F. App'x 938, 941 (4th Cir. 2010) (unpublished) (finding the admission of codefendants' guilty pleas harmless beyond a reasonable doubt considering it was an "isolated reference . . . during the five-day jury trial") (citing United States v. Blevins, 960 F.2d 1252, 1262 (4th Cir. 1992)). The same harmlessness analysis would apply to the question posed of Dr. Kourany. See (Crim. Case No. 3:00-cr-147-GCM-DSC-1, Doc. No. 1098 at 47). Accordingly, Petitioner is unable to demonstrate, based on these two isolated questions, that he suffered the type of prejudice that Strickland requires for relief.

### 3. Ineffective assistance of counsel regarding plea offers and cooperation

The Sixth Amendment right to the effective assistance of counsel extends to the plea-bargaining process. When an ineffective assistance claim arises in the plea context, the Supreme Court has said that the Strickland prejudice inquiry focuses on "whether counsel's constitutionally ineffective performance affected the outcome of the plea process." Hill v. Lockhart, 474 U.S. 52, 59 (1985). The Supreme Court has recently observed that, where counsel fails to communicate a plea offer, to show prejudice a defendant must show "a reasonable probability [he] would have accepted the . . . plea offer" and that "the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." Missouri v. Frye, 132 S. Ct. 1399, 1409 (2012); see also Lafler v. Cooper, 132

S. Ct. 1376, 1387 (2012) ("[P]rejudice can be shown if loss of [a] plea opportunity led to a trial resulting in a conviction on more serious charges or the imposition of a more severe sentence.").

Petitioner contends that Attorney Falls performed deficiently during the plea bargaining phase. (Doc. No. 1-2 at 1-2). Petitioner maintains that he has always wanted to cooperate with the Government in its ongoing investigation, and, further, that Attorney Falls failed to inform Petitioner of various facts and risks related to his case. (Id.). He continues that he would have accepted the 7-20 year plea deal offered to him on the eve of trial if Attorney Falls had advised him adequately. (Id.). Petitioner's self-serving statement that he would have pled guilty is dubious at best. At trial, at the first sentencing hearing, on appeal, at the resentencing hearing, and now in this § 2255 action, Petitioner has consistently and unequivocally maintained his innocence of any terrorism offense. His current assertion that he always wanted to plead guilty is palpably incredible. See Raines v. United States, 423 F.2d 526, 531 (4th Cir. 1970) (stating that allegations of a "vague, conclusory or palpably incredible nature" do not raise factual issues requiring a full hearing) (emphasis added)). Moreover, he cannot credibly show, as Frye and Lafler require, that he would have accepted the plea deal offered to him, because, as Attorney Falls points out in his affidavit and Petitioner does not dispute, the Government insisted that any plea deal involve the material support offense. Petitioner, to this day, has steadfastly maintained his innocence of any such offense.

Furthermore, Attorney Falls explains in his affidavit that there were attempts at both plea negotiations and cooperation. See (Doc. No. 11-1). He recalled a debriefing with FBI agents at the local jail that was abruptly ended by Petitioner and his lawyer when the FBI agents "blind-sided" Petitioner with evidence that Petitioner planned to kill the prosecutor, evidence that Petitioner vehemently denies. (Id. at 1). After that incident, Attorney Falls explained that "there

28

was a serious lack of trust on the defense's part that the Government was willing to negotiate a plea in good faith." (<u>Id.</u>). Attorney Falls related that there were, however, further plea negotiations and offers, "all of which were conveyed to Mr. Hammoud," but the parties could not reach an agreement because the Government insisted on a guilty plea to the material support charge, and Petitioner refused to do so. (<u>Id.</u> at 1-2).

Regarding the advice Attorney Falls gave to Petitioner during the negotiations, Attorney Falls recounts that he discussed with Petitioner "that this was the first terrorism trial post-9/11, and that the environment for going to trial on these charges was not good, to say the least." (<u>Id.</u> at 2). Attorney Falls continues that Petitioner "knew that the government had seized Hezbollah propaganda tapes from his home, which included some disturbing scenes, and that the Government intended to introduce these tapes at trial." (<u>Id.</u>). Attorney Falls acknowledges that he may not have discussed "every question or topic" that may be asked on cross-examination, but he reasonably explains that it is impossible to anticipate every such question. (<u>Id.</u>). Finally, regarding Petitioner's potential sentencing exposure, Attorney Falls explains that he "likely" did not advise Petitioner that "he would receive a 155-year sentence if he went to trial and lost," but Attorney Falls is "sure that [he] reviewed the federal sentencing guidelines with Mr. Hammoud . . . and [that he] would have included in [his] analysis the material support enhancement, which was the main driver of an elevated sentence," as well as the stacking provisions of the guidelines. (<u>Id.</u> at 2-3). Here, Attorney Falls' affidavit, which Petitioner has not rebutted on summary judgment with credible evidence, shows that Falls did not perform deficiently in his advice to Petitioner. Rather, Attorney Falls' advice to Petitioner regarding his likely sentence was well within the bounds of competence. Indeed, as Petitioner readily admits, Attorney Falls advised him to accept the pre-trial plea offer of 7-20 years. <u>See</u> (Doc. No. 1-2 at 2).

### 4. Ineffective assistance of counsel regarding failure to provide discovery

In the final category of his ineffective assistance of counsel claims, Petitioner asserts that Attorney Falls failed to provide him with discovery (Claim L)—specifically, a financial notebook that Petitioner maintained that would have proven that he did not donate any money to Hezbollah in May 1999. (Doc. No. 1-2 at 7-9). Petitioner's claim that Attorney Falls failed to discuss any of the discovery with him is palpably incredible, considering the publicity surrounding the case, the depth and thoroughness of Attorney Falls' questioning and arguments at trial, and Petitioner's lengthy direct examination, which Attorney Falls ably conducted. Moreover, Petitioner has not demonstrated that further discussions with him of this notebook or any other discovery would have altered the outcome of his trial, or that the lack of any discussion about them rendered his trial so fundamentally unfair and unreliable that it triggered prejudice under Strickland.

### 5. Accumulated errors

In a final, summary ineffective assistance of counsel claim, Petitioner argues that the cumulative effect of Attorney Falls' alleged errors warrants relief under Strickland. (Doc. No. 1-2 at 22). However, "there is no precedent supporting the idea that a series of 'errors' that fail to meet the standard of objectively unreasonable can somehow cumulate to meet the high burden set forth in Strickland." United States v. Thomas, 724 F.3d 632, 648 (5th Cir. 2013). For this reason, Petitioner's claim of "cumulative errors" is without merit.

### D. Trial errors

In section IV of his brief, Petitioner challenges various aspects of his conviction. As explained below, each contention is without merit.

### 1. Constructive amendment/due process claim

In his first set of trial-error claims, Petitioner alleges again that he was convicted of conspiring to provide material support to a terrorist organization in violation of conspiracy law and of due process, because the Government allegedly constructively amended the indictment at trial, alleging two conspiracies, while Petitioner was convicted of only one. (Doc. No. 1-2 at 23-30). This issue was already raised and decided on appeal, see Hammoud, 381 F.3d at 343-44, so Petitioner may not raise it again now, seeking a different result, see Withrow v. Williams, 507 U.S. at 720-721.

### 2. Ex post facto claim

Petitioner next alleges that the conspiracy count violated the Constitution's ex post facto clause because the indictment alleged that the conspiracy began before the enactment of the material support law in 1997. (Doc. No. 1-2 at 33-36). This claim has been procedurally defaulted, as Petitioner did not raise it on appeal. In any event, Count 78 alleged a substantive count of providing material support to a terrorist organization; it did not allege a conspiracy. Count 72 alleged a conspiracy. Bousley, 523 U.S. at 621; see also United States v. Pettiford, 612 F.3d 270, 279 n.7 (4th Cir. 2010). Where a defendant has procedurally defaulted a claim by failing to raise it on direct appeal, the claim is cognizable in habeas "only if the defendant can first demonstrate either 'cause' and actual 'prejudice' . . . or that he is 'actually innocent.'" Bousley, 523 U.S. at 622 (citations omitted). To show "cause" for a procedural default, the defendant must demonstrate that some objective factor external to the record impeded his counsel's efforts to bring a claim on direct appeal. Murray v. Carrier, 477 U.S. 478, 497 (1986); Turner v. Jabe, 58 F.3d 924, 927 (4th Cir. 1995). It is not enough that counsel failed to present an argument that was unlikely to succeed; rather, cause only exists based on counsel's failure to present the claim if the claim "'is so novel that its legal basis is not reasonably available to

counsel.'"  Bousley, 523 U.S. at 622 (quoting Reed v. Ross, 468 U.S. 1, 16 (1984)).  There was no such bar here.  In attempting to avoid a procedural default based on the "actual innocence" exception to the default, a defendant must show, by clear and convincing evidence, United States v. Mikalajunas, 186 F.3d 490, 494 (4th Cir. 1999), that it is more likely than not that no reasonable juror would have convicted him because of his "factual innocence, not mere legal insufficiency," Bousley, 523 U.S. at 623.  Petitioner cannot make this showing.  The evidence adduced at trial, including significant evidence dating Petitioner's illegal activities to 1997, or thereafter, forecloses the actual innocence exception.  Furthermore, the evidence to which Petitioner now objects, even if it preceded the enactment of the material support law, could have been admitted at trial under Federal Rule of Evidence 404(b).  Thus, this claim fails.

### 3. Challenges to element of "material support"

Petitioner lodges two challenges to the "material support" element of 18 U.S.C. § 2339B: (1) that the Government failed to prove that the material support went to Hezbollah, the organization, rather than individual persons; and (2) that the statute was "vague" by failing to include a knowing mens rea element before its 2004 amendment.  See (Doc. No. 1-2 at 41-46). Both of these claims are procedurally defaulted because Petitioner did not raise them on appeal. In any event, Petitioner cannot rebut the evidence presented at trial that Petitioner solicited money at Thursday night meetings to support "The Resistance" and that, on at least one occasion, he sent money directly to a Hezbollah military leader, Harake, via Harb.  Accordingly, this claim fails.

### 4. Challenge to Count 78

In another challenge to his conviction, Petitioner argues that the Court "could have and should have dismissed" Count 78 and that a "reasonable jury would have acquitted Hammoud on

Count 78 if the trial attorney made sufficient argument with the above facts to prove 'the link' and the agreement did not exist [between Hammoud and Harb]." (Doc. No. 1-2 at 68). It is unclear exactly what Petitioner is arguing here, but, in any event, Petitioner failed to make this precise challenge on appeal so it has been procedurally defaulted. To the extent this claim relates to Petitioner's challenge, already made on appeal, concerning single and multiple conspiracies, this issue has been decided in the Government's favor and may not be relitigated now.

### E. Ineffective assistance of sentencing counsel

Petitioner next makes numerous allegations of ineffective assistance of counsel against his sentencing counsel, Stanley Cohen, at the first sentencing hearing. Each claim is without merit. Petitioner first argues that Attorney Cohen failed to meet with him to discuss the PSR at any point before sentencing. (Doc. No. 1-2 at 47). The transcript of the sentencing hearing disputes this assertion. That is, Cohen stated at the sentencing hearing, without any objection from Petitioner, that "I read the transcript, have taken a look at the voluminous discovery, had a chance to speak with the defendant on more than enough occasions to reach concern [sic] conclusions." (Doc. No. 1082 at 3: 2/28/03 Sent. Tr.). In any event, Petitioner has failed to allege any prejudice as a result of this alleged deficiency. Petitioner's second claim—that counsel failed to make particular objections to the PSR—is also without merit, as it is rebutted by the sentencing transcript, in which Attorney Cohen reiterated with specificity the objections he made, both in writing and orally at the hearing. Petitioner also fails to show how the outcome of his sentencing proceeding would have been any different if Attorney Cohen had argued the objections any differently.

In his third claim, Petitioner alleges that Attorney Cohen failed to retain an accountant or

otherwise challenge the loss amount and, if he had, then the burden of proving loss amount would have shifted to the Government. (Doc. No. 1-2 at 51-63). This claim fails, first, because the burden of proving loss amount was always with the Government, and Attorney Cohen specifically argued at the sentencing hearing that the Government failed to meet that burden. <u>See</u> (<u>Id.</u>, Doc. No. 1082 at 15). Further, Petitioner does not credibly prove that this Court would have sustained any objection to the loss amount at that hearing if Attorney Cohen had taken these steps. Accordingly, he cannot demonstrate prejudice.

Petitioner also makes numerous claims as to mitigating arguments Attorney Cohen should have made at the sentencing hearing. <u>See</u> (Doc. No. 1-2 at 51-68). In essence, Petitioner wishes that Attorney Cohen had re-tried the case at the sentencing hearing, in much the same way counsel at the re-sentencing hearing did. However, as re-sentencing counsel found out, re-trying the case at the sentencing hearing was not helpful, so there was no deficient performance by Attorney Cohen in foregoing the trial arguments in favor of arguments that were relevant to the determination of a sentence under a mandatory guideline regime. Furthermore, Petitioner's sentence was vacated, and re-sentencing counsel was free to make these same arguments at the resentencing hearing, when the guidelines were merely advisory. Petitioner is thus unable to demonstrate deficient performance or prejudice.

### F. Ineffective assistance of appellate counsel

Finally, Petitioner lodges a generalized, categorical claim of ineffective assistance of appellate counsel. Petitioner argues only that "[t]o the extent appellate counsel failed to preserve and to appeal the instances of identifies [sic] prosecutorial misconduct, constructive amendment of the Second Superseding Indictment, errors by trial counsel or sentencing counsel, appellate counsel were objectively ineffective." (Doc. No. 1-2 at 69). This generalized allegation is much

too vague and conclusory to warrant relief.  See Raines, 423 F.2d at 531.  Moreover, Petitioner

cannot overcome the strong presumption afforded appellate counsel.  Appellate counsel is

accorded a "'presumption that he decided which issues were most likely to afford relief on

appeal.'"  Bell v. Jarvis, 236 F.3d 149, 164 (4th Cir. 2000) (en banc) (quoting Pruett v.

Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993)).  "Counsel is not obligated to assert all

nonfrivolous issues on appeal, as '[t]here can hardly be any question about the importance of

having the appellate advocate examine the record with a view to selecting the most promising

issues for review.'"  Id.  "[W]innowing out weaker arguments on appeal and focusing on those

more likely to prevail, far from being evidence of incompetence, is the hallmark of effective

appellate advocacy."  Thus, while "it is still possible to bring a Strickland claim based on

counsel's failure to raise a particular claim on direct appeal, . . . it will be difficult to demonstrate

that counsel was incompetent."  Id.  Considering that none of Petitioner's arguments were

meritorious, Petitioner cannot overcome the presumption of reasonableness afforded his

appellate counsel.  Thus, this claim is without merit.

## IV.    CONCLUSION

For the reasons stated herein, the Court will dismiss the § 2255 petition and grant

Respondent's motion for summary judgment.

   **IT IS, THEREFORE, ORDERED** that:

1.      Petitioner's § 2255 motion to vacate, (Doc. No. 1), is **DENIED** and

   **DISMISSED**.

2.     The Government's Motion for Summary Judgment, (Doc. No. 12), is

   **GRANTED**.

3.      Petitioner's Motion for Recusal of the undersigned, (Doc. No. 7), and Petitioner's

Motion for Discovery, (Doc. No. 16), are **DENIED**.  Petitioner's Motion to Rule

on Petitioner's Motion to Recuse, (Doc. No. 20), is **GRANTED** to the extent that

the Court has now ruled on Petitioner's motion to recuse.

4.      Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, this Court

declines to issue a certificate of appealability as Petitioner has not made a

substantial showing of the denial of a constitutional right.  28 U.S.C. §

2253(c)(2); <u>Miller–El v. Cockrell</u>, 537 U.S. 322, 336-38 (2003) (in order to

satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find

the district court's assessment of the constitutional claims debatable or wrong).

Signed: December 10, 2015

Graham C. Mullen
United States District Judge